AVAKIAN BROS., INC. *v.* UNITED STATES (No. 4758)[1]

United States Court of Customs and Patent Appeals, June 17, 1953

*John D. Rode* (*Ellsworth F. Qualey* of counsel) for appellant.
*Charles J. Wagner*, Acting Assistant Attorney General (*Richard F. Weeks* and *Dorothy C. Bennett*, special attorneys, of counsel), for the United States.

[Oral argument April 15, 1953, by Mr. Qualey and Mr. Weeks]

Before GARRETT, Chief Judge, and O'CONNELL, JOHNSON, WORLEY, and COLE Associate Judges

JOHNSON, Judge, delivered the opinion of the court:

This is an appeal from the judgment of the United States Customs Court, Third Division, rendered pursuant to its decision, C. D. 1453, overruling the protest filed by the importer against the rate of con-

[1] C. A. D. 532.

version applied by the Collector of Customs at the port of New York in converting Iranian Rails into United States Dollars on certain importations from Iran.

The importations involved in the protest are 58 bales of rugs which were transported overland from Iran to Iraq on March 23, 1949. On June 4, 1949 these rugs were laden on the s/s Steel Artisan at the port of Basra(h), Iraq, for shipment to the United States. After leaving the Iraq port the vessel called at the port of Khorramshahr, Iran, from which port it sailed on June 8, 1949, bound for the United States. The importing vessel called at various other ports on the voyage but such ports are not pertinent to the question here involved. The above facts are conceded by both parties to this dispute.

The question before this court is to determine the date of exportation of the rugs from Iran since this is the date to be used for currency conversion purposes under section 522 of the Tariff Act of 1930. Appellant claims that the actual export of the rugs occurred on March 23, 1949, the date the rugs left the country of Iran and crossed the border into Iraq. The customs officials contend that the actual exportation date is June 8, 1949, the date the rugs last left the jurisdiction of Iran.

Section 522 of the Tariff Act of 1930 and the pertinent provisions of the Customs Regulations of 1943 with reference to determining the date of exportation for purposes of currency conversion are as follows:

Sec. 522. (31 U. S. C. 372) Conversion of currency.

(a) Value of Foreign Coin Proclaimed by Secretary of Treasury.—The value of foreign coin as expressed in the money of account of the United States shall be that of the pure metal of such coin of standard value; and the values of the standard coins in circulation of the various nations of the world shall be estimated quarterly by the Director of the Mint and be proclaimed by the Secretary of the Treasury quarterly on the 1st day of January, April, July, and October in each year.

(b) Proclaimed Value Basis of Conversion.—For the purpose of the assessment and collection of duties upon merchandise imported into the United States on or after June 17, 1930, whenever it is necessary to convert foreign currency into currency of the United States, such conversion, except as provided in subdivision (c), shall be made at the values-proclaimed by the Secretary of the Treasury under the provisions of paragraph (a) of this section, for the quarter in which the merchandise was exported.

(c) Market Rate When no Proclamation.—If no such value has been proclaimed, or if the value so proclaimed varies by 5 per centum or more from a value measured by the buying rate in the New York market at noon on the day of exportation, conversion shall be made at a value measured by such buying rate. * * *

Customs Regulations of 1943.

Sec. 16.4 Conversion of currency—

(a) * * *

(b) The date of exportation for currency conversion shall be fixed in accordance with section 14.3 of these regulations.

Sec. 14.3 Appraisement of merchandise; determination of value—

(a) * * *

(b) The time of exportation referred to in section 402 of the tariff act is the date on which the merchandise actually leaves the country of exportation for the United States.⁵ * * *

⁵ If the merchandise is shipped directly by water from the country of export, the date of the sailing of the vessel is the date of exportation. Since the act of exportation is not complete until the merchandise finally leaves the jurisdiction of the exporting country, if a vessel with merchandise on board sails from two or more ports, or more than once from the same port, of the exporting country, whether or not stopping on the intervening voyage at a port of another jurisdiction, or if the merchandise is transshipped in another jurisdiction and subsequently reenters the jurisdiction of the exporting country on another vessel, or if the merchandise is transshipped to another vessel in the same jurisdiction, the date the vessel on which the merchandise finally leaves the exporting country sails from the last port thereof is the date of exportation. When the merchandise is shipped from an interior country through the ports of another country or from a country contiguous to the United States, the date of exportation is the date on which the merchandise crosses the border of the country of exportation and passes beyond the control of the government of such country. These provisions apply also to merchandise shipped directly by air.

Questions of this nature have been before the courts at various times and it has been uniformly held that the date of exportation is the date that the importing vessel last sails from the exporting country. One of the earliest cases on this question is *Forman* v. *Peaslee,* 9 Fed. Cas. 452, which was decided in 1857. That case held that when merchandise was shipped from Wales, in Great Britain, to the United States by way of Liverpool, the date of exportation was the date the importing vessel finally cleared from Liverpool. The reason for this holding was that until the vessel was finally cleared from the exporting country the merchandise was considered under the control of that country and subject to search and seizure by that country. The rule set forth in the *Forman* case, *supra,* has been affirmed in many other cases. See *American Shipping Co.* v. *United States,* Abs. 47519, 45 Treas. Dec. 1007; *United States* v. *Abell Forwarding Co.,* Reap. Dec. 4248, 73 Treas. Dec. 1426.

In the case of *B. H. Dyas Corp.* v. *United States,* T. D. 43600, 56 Treas. Dec. 268, the same rule was applied under a different set of facts. In that case the merchandise was laden at Havre, France, and the importing vessel sailed from that port on August 6, 1924, going to Antwerp, Belgium. The vessel left Antwerp August 17, 1924, for Bordeaux, France and sailed therefrom on August 23, 1924 for the United States. The court held that the date of exportation was August 23, 1924, when the importing vessel last left the jurisdiction of France. In reaching this decision the court said, at page 270:

When it left Havre and put in at Antwerp it is true it left the jurisdiction of France, but it again entered the territorial jurisdiction of France by the stop made at Bordeaux. In making the stop at Bordeaux it returned to the jurisdiction of France and was subject to search and seizure by that government.

Other cases reaching the same conclusion under a similar set of facts are: *Randall* v. *United States,* Abs. 47522, 46 Treas. Dec. 604; *W. J. Byrnes & Co.* v. *United States,* Abs. 12666, 58 Treas. Dec. 893;

*F. F. G. Harper Co.* v. *United States,* Abs. 13158, 58 Treas. Dec. 980; *Lian Bros.* v. *United States,* 15 Cust. Ct. 58, C. D. 941.

It appears that no case on the question raised in the instant case has come before this court, and only one case appears to have been before our predecessor, the United States Court of Customs Appeals, on a question similar to the one raised in the instant case. That was the case of *Roessler & Hasslacher Chemical Co.* v. *United States,* 1 Ct. Cust. Appls. 290, T. D. 31353, in which the question of the date of exportation as between the time the goods were placed aboard a train for transportation to a port for reshipment to the United States and the time of the sailing of the importing vessel for the United States, was decided by the court. In that case the court held that the correct date of exportation was the date of sailing of the importing vessel, citing with approval the case of *Forman* v. *Peaslee, supra.*

The appellant in the instant case agrees with the decisions reached in the *Forman* case, *supra,* and the *Roessler* case, *supra,* but argues that the decisions of the *Dyas* case, *supra,* and the other similar cited cases, *supra,* are incorrect. The importer bases this argument on the rulings of *Swan & Finch Co.* v. *United States,* 190 U. S. 143; *United States* v. *National Sugar Refining Co.,* 39 C. C. P. A. (Customs) 96, C. A. D. 470; *Flagler* v. *Kidd et al.,* 78 Fed. 341. These cases held that the legal notion of exportation is the severance of goods from the mass of things belonging to this country with an intention of uniting them with the mass of things belonging to some foreign country. The *Flagler* case, *supra,* also stated that goods are imported when they are brought within this country with the intent to land them here. Under these definitions the importer claims that the transportation of the rugs from Iran to Iraq on March 23, 1949 was the actual exportation of the rugs since they were severed from the mass of things belonging to Iran and the intention was to unite them with the mass of things belonging to the United States. Thereafter, although the goods were physically present in Iran when the s/s Steel Artisan called at the port of Kohorramshahr, there was no intent to unlade them and consequently there was no importation at that time and therefore no re-exportation when the vessel sailed on June 8, 1949.

The question raised by the importer as to the correctness of the decision in the *Dyas* case, *supra,* and the other similar decisions has never been before this court. Therefore, we will consider these decisions in view of our holding in the *National Sugar Refining Co.* case, *supra,* as to the word "exportation" to determine whether they can be reconciled or not. In the *National Sugar Co.* case, *supra,* at page 101, we first quoted the definition of exportation:

An exportation is a severance of goods from the mass of things belonging to this country with the intention of uniting them to the mass of things belonging to some foreign country.

Then we added:

> While such a definition establishes the character of an outbound shipment as an exportation or not at the time the merchandise leaves the United States, *it does not completely eliminate subsequent events from consideration.* (Emphasis supplied.)

From the above quoted language it is apparent that while we are in agreement with the basic definition of exportation we are of the opinion that subsequent events might change the character of the shipment such that it would not be an exportation. From the foregoing it is obvious that we must not only consider the shipment of the goods but also any subsequent events that might affect those goods. In that case we were considering the intention of the party exporting the merchandise from this country, but the same limitation applies equally well to the physical severance from the exporting country. This we will attempt to point out below.

Considering now the decision of the Customs Court in the *Dyas* case, *supra,* and the other similar cases, that Court held that when the merchandise that was once out of the territorial jurisdiction of the exporting country returned to their jurisdiction they were again subject to search and seizure and therefore the exportation was not complete until the goods finally left the jurisdiction of the exporting country. With this view we are in complete agreement. We can readily visualize a case where the goods having left the jurisdiction of the exporting country were returned to that jurisdiction and the government of the exporting country, for one reason or another, seized the goods as a product no longer qualified for export from that country. In such a case, even though this country considered the merchandise as having been exported from that country, the government of that country by its action would have completely nullified the exportation. Therefore, this country would be in the anomalous position of regarding goods as having been exported from a foreign country while that country was actually in control of the goods and refusing to allow them to be carried out of their country. Manifestly, a view that could lead to such a situation should not be adopted by us.

In view of the above we are of the opinion that although there had been a physical severance of the merchandise from the exporting country in both the *Dyas* case and in the instant case before us, subsequent events, the return of the merchandise to the territorial jurisdiction of the exporting country, made the act of physical severance incomplete, and such act was not complete until the merchandise finally passed beyond the control of the exporting country.

For the reasons hereinbefore expressed we hold that the date of exportation is the date on which the merchandise finally leaves the exporting country and passes beyond its control, which in the instant case was June 8, 1949. Therefore, the judgment of the Customs Court is correct and such judgment is *affirmed.*